**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Grow Biz International, Inc., a Minnesota corporation,

Plaintiff,

v.

MNO Inc., a North Carolina corporation, Anne M. Mathias, an individual, and Dean T. Mathias, an individual,

Defendants.

Civil No. 01-1805 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Mark Hooley, Esq., general counsel for Plaintiff, and Jay Schlosser, Esq., and Jeffrey Keyes, Esq., Briggs & Morgan, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, appeared on behalf of Plaintiff.

Calvin Litsey, Esq., and John Borger, Esq., Faegre & Benson, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402, appeared on behalf of Defendants.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 4, 2002, pursuant to Plaintiff's Motion for Preliminary Injunction and Defendants' Motion to Dismiss or Transfer the Case Due to Improper Venue and for Partial Dismissal for Lack of Subject Matter Jurisdiction. In the Amended Complaint, Plaintiff alleges three claims for breach of contract relating to various franchise agreements.[1] For the reasons set forth below, Defendants' motion is denied and Plaintiff's motion is denied.

---

[1] Additional claims were alleged in the original Complaint, but the parties stipulated to the filing of an Amended Complaint after the hearing on this matter. Accordingly, the Court considers the matter to relate solely to those claims set forth in the Amended Complaint.

JAN 2 5 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

**Background**

Plaintiff Grow Biz International, Inc. ("Grow Biz") is the franchisor of a chain of retail sporting goods stores which operate under the name "Play It Again Sports" ("PIAS"). The PIAS franchise stores sell both new and used sporting goods.

Defendant MNO, Inc., is a corporate entity. Defendants Anne and Dean Mathias are husband and wife; the Mathias are the guarantors of MNO, Inc.

On or about September 24, 1991, Grow Biz entered into a franchise agreement ("the 1991 agreement") with John C. and Beverly Anne Downs. On or about August 24, 1994, Defendants MNO, Inc. and Dean Mathias entered into a contract with the Downs and Grow Biz pursuant to which Defendants assumed all of the rights, duties, and obligations of the 1991 agreement. Under the terms of the 1991 agreement, Defendants operated a PIAS franchise store at 6282-102 Glenwood Avenue, Raleigh, N.C. ("the Glenwood store").

In addition to the Glenwood store, the Defendants operate five other PIAS franchise stores. Specifically, Defendants assumed rights to a 1992 franchise agreement, pursuant to which they operate a PIAS franchise store in Wilmington, N.C.; Defendants entered into another 1992 franchise agreement, pursuant to which they operate a PIAS franchise store in Chapel Hill, N.C.; Defendants entered into a 1994 franchise agreement, pursuant to which they operate a PIAS franchise store in Fayetteville, N.C.; Defendants entered into a 1997 franchise agreement, pursuant to which they operate a PIAS franchise store in Greenville, N.C.; and Defendants entered into a 1999 franchise agreement, pursuant to which they operate a second PIAS franchise store in Raleigh, N.C.

Each of the franchise agreements had a term of 10 years. Moreover, each agreement contains both a within-term and post-term noncompetition covenant. The within-term

noncompetition covenant prohibits the franchisee from operating, directly or indirectly, any other sporting goods business; there is no geographic limitation on the within-term noncompetition covenant. The post-term noncompetition covenant prohibits the franchisee, for a period of one year following expiration of the franchise agreement, from operating, directly or indirectly, another sporting good store at the location of the franchise store, within six miles of the franchise store, or within six miles of any other PIAS franchise store.

The record indicates that Defendants Anne and Dean Mathias attended franchisee training programs in Minnesota both before and after assuming the 1991 agreement. The record further indicates that the assumption of the 1991 agreement was finalized when the assignment contract was signed, in Minnesota, by a representative of Grow Biz.

The 1991 agreement expired "naturally" on September 24, 2001. Despite the post-term noncompetition covenant of the 1991 agreement and the within-term noncompetition covenants of the remaining five franchise agreements, the Defendants continue to operate a sporting goods store at the Glenwood Avenue location. The new store, operating under the name "Sports X-Change," sells primarily, if not exclusively, new sporting goods.

Grow Biz brought this action in this Court on the same day on which they were served with a Complaint, filed by Defendants, in a declaratory judgment action filed in North Carolina state court. The declaratory judgment action seeks a declaration that the noncompetition covenants of the various franchise agreements are void as violative of North Carolina law. Grow Biz has removed the North Carolina declaratory judgment action to Federal Court on the grounds of diversity jurisdiction.

Grow Biz currently seeks an injunction precluding Defendants from using the Play It Again Sports mark at the Glenwood Avenue location and from continuing to operate the Sports

X-Change at that location. Defendants seek to have this matter dismissed for improper venue or, in the alternative, transferred to North Carolina; Defendants further seek to have Grow Biz's state law claims dismissed for lack of subject matter jurisdiction, alleging that the amount in controversy does not meet the threshold requirement.

**Discussion**

**1. Subject Matter Jurisdiction**

Defendants assert that this Court lacks subject matter jurisdiction over these claims because the threshold amount-in-controversy required to invoke diversity jurisdiction has not been met. The Court disagrees. "The amount in controversy in a suit for injunctive relief is measured by the value to the plaintiff of the right sought to be enforced." *Burns v. Massachusetts Mut. Life Ins. Co.*, 820 F.2d 246, 248 (8th Cir. 1987). Here, Grow Biz seeks enforcement of a noncompetition agreement; Grow Biz asserts that, if that noncompetition agreement were enforced, Grow Biz could obtain a new franchise agreement for a franchise in the general vicinity of the Glenwood Avenue location. Given that PIAS franchises average revenues of $500,000 per year,[2] Grow Biz recovers between four and five percent of those revenues as royalties, the PIAS franchise agreements have a term of 10 years, and Grow Biz earns up to $20,000 in initial franchise fees, the value of a new PIAS franchise at or around the Glenwood Avenue locations would seem to far exceed the $75,000 jurisdictional requirement. Accordingly, the Court finds that it has subject matter jurisdiction over the claims.

**2. Venue**

The general federal venue statute reads:

---

[2] In fact, according to Grow Biz, the revenues from the Glenwood Avenue location have been significantly higher.

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a).

Defendants argue that §§ 1391(a)(2) and 1391 (a)(3) may only form the basis for proper venue if there is no district which satisfies the requirements of § 1391(a)(1). *See Dashman v. Peter Letterese & Assocs., Inc.*, 999 F. Supp. 553, 553-55 (S.D.N.Y. 1998), *Cobra Partners L.P. v. Liegl,* 990 F. Supp. 332, 333-34 (S.D.N.Y. 1998). In other words, where, as here, there is a venue which meets the requirements of § 1391(a)(1) (specifically, North Carolina), the Court may not turn to § 1391(a)(2) or § 1391(a)(3) to justify venue here in Minnesota. There is a split in authority regarding whether § 1391(a)(2) provides an equal and wholly independent basis for venue. *See Hall v. South Orange*, 89 F. Supp. 2d 488, 491-93 (S.D.N.Y. 2000); *Gregory v. Pocono Grow Fertilizer Corp.*, 35 F. Supp. 2d 295, 297-98 (W.D.N.Y. 1999).

Given that neither the parties nor the Court have found any case in which the Eighth Circuit has expressed a position on the issue, the Court must make its own determination about which faction in this split has it right. The Court declines to adopt the position advocated by the Defendants, finding instead that the reasoning of the *Hall* and *Gregory* cases is more persuasive. Specifically, the plain language of the venue statute supports the notion that each basis for venue stands on separate and equal footing; given that the language of the statute is clear, there is no call for the Court to wade into legislative history, even though that history might suggest that the statutory scheme was meant to be hierarchical.

In light of that legal determination, the Court must next consider whether "a substantial part of the events or omissions giving rise to the claim occurred" in Minnesota. Plaintiff asserts that this Court's ruling in *K-Tel Int'l, Inc. v. Tristar Products, Inc.*, 169 F. Supp. 2d 1033 (D. Minn. 2001) is dispositive and that the fact of the underlying agreement's execution in Minnesota, coupled with the Defendants' trips to Minnesota on franchise-related business, render venue in Minnesota proper. The Court agrees.

In the instant case, the following events related to the action took place in Minnesota: (1) the Defendants' application to operate a franchise was sent to and approved in Minnesota; (2) the Defendants attended a "discovery day," during which they learned about the PIAS operations, in Minnesota; (3) the contracts were executed in Minnesota when signed by a representative of Grow Biz in Minnesota; (4) the Defendants attended a week-long training session and several conferences in Minnesota[3]; and (5) Grow Biz sent Defendants proprietary information, including marketing and advertising information, from Minnesota.[4] The Court finds that these contacts are substantial enough to render venue in Minnesota proper; the fact that venue might *also* be proper in North Carolina, because that is where the alleged breach occurred, is irrelevant. *See Dollar Discount Stores of America, Inc. v. Petrusha*, 2001 WL 881725, *1 (E.D. Pa. 2001).

---

[3] The Court notes that these training sessions and conferences constitute part of the consideration given by Grow Biz to the Defendants under the terms of the contracts.

[4] Similarly, this proprietary information constitutes a substantial part of the consideration for the contracts. The Defendants seem to assert that this proprietary information was of little use to them, but it was nevertheless a substantial part of the overall consideration given to them in exchange for royalties.

Although the Defendants have styled their motion to dismiss or transfer venue as based solely on the propriety of venue, the Defendants further argue factors more appropriate to a motion to transfer for forum non conveniens. Forum non conveniens exists as a method of allowing courts to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S. Ct. 839, 842 (1947). Trial courts have broad discretion in deciding a motion to dismiss based on forum non conveniens. *See Reid-Walen v. Hansen*, 933 F.2d 1390, 1393-4 (8th Cir. 1991), citing *Piper Aircraft Co. v. Reyno*, 454 U.S. at 235, 257, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419 (1981). The U.S. Supreme Court has outlined a number of private and public factors to be considered by the trial court in making its decision. The private factors to be considered include: the private interest of the litigant, relative ease of access to sources of proof, availability of compulsory process for attendance of the unwilling, the cost of obtaining witnesses, the need to view the premises, the enforceability of a judgment, and "all other practical problems that make the trial of a case easy, expeditious, and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S. Ct. at 843. The court must also consider public factors which include: the burden of jury duty on the local community, the local interest in having the matter decided at home, congestion in courts, and the difficulty in applying foreign law. *Gilbert*, 330 U.S. at 508-9, 67 S. Ct. at 843. The balance must be strongly in favor of the defendant in order to upset plaintiff's choice of forum. *Reid-Walen*, 933 F.2d at 1394, citing *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 342 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042, 104 S. Ct. 708, 79 L. Ed. 2d 172 (1984) (citations omitted). Therefore, the defendant has the burden of persuasion in proving "all elements necessary for the court to dismiss a claim based on forum non conveniens." *Reid-Walen*, 933 F.2d at 1393.

The Defendants assert that there are three reasons why the Court should consider transferring the case to North Carolina: (1) the franchise agreements specify that North Carolina law should be applied; (2) there is an earlier-filed declaratory judgment action already pending in North Carolina; and (3) "most of the relevant documents and witnesses concerning the dispute are located in North Carolina." (Defendants' Memorandum in Support of Motion to Dismiss or Transfer Case Due to Improper Venue at 11.)

The simple fact that this Court will be called upon to interpret and apply North Carolina law is of little significance in the forum non conveniens calculus. *See K-Tel Int'l, Inc.*, 169 F. Supp. 2d at 1044. While North Caroline courts might enjoy some advantage in interpreting and applying North Carolina law, that advantage alone is insufficient to trump Grow Biz's choice of forum.

Defendants' contention that the first-filed North Carolina lawsuit compels transfer of venue is similarly unpersuasive. "The well-established rule is that in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case.'" *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1005 (8th Cir. 1993) (quoting *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985)). However, certain compelling circumstances may justify a break with the first-filed rule. Two factors which may indicate such compelling circumstances are the proximity in time between the two actions (suggesting a race to the courthouse steps) and the fact that the first-filed action is a declaratory judgment action. *See Northwest Airlines, Inc.*, 989 F.2d at 1007. These two factors, especially taken together, may indicate that the first-filing party was acting in bad faith in an effort to "forum shop." *See id.* It may ultimately prove that, in this case, the presence of these two

factors does not justify a break from the first-filed rule.[5] Indeed, it is troubling to the Court that, apparently, neither party as yet asked the North Carolina court to abstain or to enjoin action in this Court; certainly these two cases should not both proceed to a final resolution. However, at present, the Court notes the very real possibility that the North Carolina court may abstain. As a result, the mere fact of a parallel action in North Carolina does not, at this time, justify this Court abdicating otherwise proper jurisdiction over this litigation.

With respect to the availability of witnesses and evidence, Defendants cite to the Affidavit of Dean Mathias to support the contention that North Carolina would be the better forum. Mr. Mathias indicates that all of Defendants' records relating to the franchise agreements are in North Carolina; however, it is not clear that the volume of these records is particularly large, and Grow Biz's records are, presumably, in Minnesota. Mr. Mathias further notes that all of Defendants' current managers, employees, and customers are in North Carolina; however, the Court cannot see how any of these people would constitute relevant witnesses in the current contract dispute.[6] At a minimum, Defendants cannot convince the Court that such a large number of these people would be called upon to testify that it would tip the scales in favor of overriding Plaintiffs' choice of forum.

---

[5] For example, in the *Northwest Airlines* case, the district court found that these two factors did not justify a break from the first-filed rule, and the Eighth Circuit agreed.

[6] In fairness to the Defendants, the initial Complaint–from which the parties were working when briefing these motions–also alleged claims for trademark infringement. The people Mr. Mathias mentions might have been relevant witnesses to a dispute over trademark infringement. But the trademark infringement claims have been dismissed by the stipulation of the parties, and the Court cannot fathom what information these people might have about the contracts at issue.

In short, none of the factors raised by the Defendants, either individually or in totality, justify this Court ignoring the Plaintiff's choice of forum in favor of transferring this action to North Carolina.

### 3. Motion for Preliminary Injunction

In the Eighth Circuit, a motion for preliminary injunctive relief may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

#### a. Likelihood of Success on the Merits

Defendants do not contest that their actions–opening a sporting goods store in the precise location of their defunct PIAS franchise–violates the plain language of both the in-term and post-term noncompetition covenants. Defendants assert, however, that these provisions are all void and unenforceable under North Carolina law. The Court does not agree.

First, the Court notes that the operation of the Sports X-Change is alleged to violate two separate types of covenants not to compete. First, the operation of the Sports X-Change violates the in-term anticompetition covenant of the surviving franchise agreements. Second, the

operation of the Sports X-Change violates the post-term anticompetition covenant of the defunct franchise agreement. Defendants suggest that the Court should not even consider the post-term covenant because the effect of the in-term covenants, if they are found to be valid, is to prohibit the Defendants from operating any sporting goods store for the next nine years. However, what the Defendants can or cannot do at other locations over the course of the next nine years is not the subject of this motion for preliminary injunction. Rather, the Court's sole job today is to determine whether the Defendants' current conduct of operating a sporting goods store at the Glenwood Avenue location violates their contractual obligations. Thus, the Court need only find that one of the covenants not to compete is valid (or probably valid) and that it is being breached; either covenant, in-term or post-term, would serve as an equal and independent basis for an injunction.

The Court looks, then, at the post-term covenant contained in the defunct franchise agreement. That contract provision prohibits the Defendants from operating a sporting goods store at the Glenwood Avenue location, within a six-mile radius of the Glenwood Avenue location, or within a six-mile radius of any PIAS franchise. The Court finds that this provision is quite likely to be valid and enforceable under North Carolina law.

Under North Carolina law, a covenant not to compete will be upheld if: (1) it is in writing and signed by the one who agrees not to compete; (2) it is founded on valuable consideration; (3) it is necessary to protect the legitimate interest of the one who is to benefit from the covenant; (4) it is reasonable in respect to time and territory; and (5) it does not interfere with the public interest. *See Keith v. Day*, 81 N.C. App. 185, 192 (N.C. App. 1986). North Carolina law recognizes a distinction between covenants not to compete in the context of a

sale of a business[7] and similar covenants in the context of a contract of employment; the latter are more closely scrutinized than the former. *See id.*

Defendants essentially raise two challenges to the post-term covenant not to compete. First, Defendants suggest that the covenant is not necessary to protect a legitimate business interest because it prohibits operation of *any* sporting goods store rather than just sporting goods stores that sell used equipment. This strikes the Court as a red herring. It is uncontested that PIAS franchises sell both new and used sporting goods. As a result, it is perfectly reasonable that they compete with stores selling new sporting goods, stores selling used sporting goods, and stores selling both.

Defendants further argue that the post-term covenant not to compete is unreasonable as to territory because the geographic limitation is unreasonably vague. *See Professional Liability Consultants, Inc. v. Todd*, 468 S.E.2d 578 (N.C. App. 1996) (Smith, J., dissenting), *rev'd*, 478 S.E.2d 201 (N.C. 1996) (adopting, without further comment, reasoning of Smith dissent) (finding that a non-compete agreement which prohibited competition in the territory occupied by the employer's customers was too vague as to geographic scope to be enforceable). Specifically, Defendants assert that the prohibition on competing within a six-mile radius of any PIAS location is too vague because it does not specify where those PIAS locations are, and it is subject to change over time. The Court finds that the geographic limitation in the instant covenant not to compete is sufficiently specific and tailored enough to pass muster under North Carolina law.

---

7 Although the covenant at issue here does not relate specifically to the sale of a business, the Court finds that the circumstances here–the lapse of a franchise agreement–are more closely analogous to the sale of a business than to an individual employment context.

First, the Court notes that, while the location of the PIAS franchises is not spelled out in the contract, those locations are readily ascertainable. Moreover, the reference to PIAS locations generally, rather than to specific addresses of existing franchises, is both necessary and reasonable in light of the business interest the covenant seeks to protect. Given that the franchise agreements are on 10-year terms, there is no way, when the agreements are signed, to know the specific locations of PIAS franchises as they will exist at the expiration of the franchise agreement (the point at which the post-term covenant becomes relevant). Accordingly, the covenant could not be more narrowly tailored to protect Grow Biz's legitimate business interests. The Court notes, however, that the alleged "ambiguity" of the covenant does not necessarily operate to the detriment of the franchisee; if the number of PIAS franchises were to decrease over the course of the 10-year agreement, the geographic scope of the covenant not to compete would similarly shrink. Thus, the Court finds that the geographic scope defined in the agreement is neither overly ambiguous nor overly broad on its face, and it is certainly neither overly ambiguous nor overly broad in practice.

The Court finds, then, that the post-term covenant not to compete contained in the defunct franchise agreement is likely enforceable. Since there is no question that Defendants' conduct–operating a sporting goods store in the precise location of the defunct PIAS franchise–violates that covenant not to compete, the Court finds that there is a substantial likelihood that Grow Biz will succeed on the merits of its claim.

**b. Irreparable Harm and the Balance of Harms**

Having concluded that Grow Biz is likely to succeed on the merits of its claim, the Court now turns its attention to the threat of irreparable harm to Grow Biz if an injunction is not issued and any countervailing harm which is likely to accrue to Defendants if an injunction *is* issued.

With respect to both of these Dataphase factors, the Court finds that the record and arguments mitigate against an injunction.

In the context of an action to enforce a covenant not to compete, the "irreparable harm" analysis is more properly framed in terms of whether the plaintiff has an adequate remedy at law. *See A.E.P. Industries, Inc.*, 302 S.E.2d 754, 762 (N.C. 1983). Grow Biz cites *A.E.P. Industries* for the proposition that the breach of an enforceable non-compete agreement is presumed to cause irreparable harm and, moreover, that a contract provision specifying that money damages are inadequate provides meaningful evidence of the inadequacy of money damages.

This case, however, is readily distinguishable from *A.E.P. Industries* and the other cases cited by Grow Biz. Those cases all involve former employees who, after leaving the employ of the business which is the beneficiary of the covenant, engage in head-to-head competition with their former employers, actively soliciting or servicing customers who might otherwise continue to utilize the services of the former employer and that employer's other sales-people. In this situation, however, Grow Biz's ability to compete is more speculative: Grow Biz could only compete with Sports X-Change if Grow Biz were able to obtain another PIAS franchisee in the relevant market. Grow Biz has suggested that they have a *desire* to do just that, but they have not offered any evidence that they have the *ability* to secure a new franchisee. Because Grow Biz apparently lacks the ability to move immediately into the market occupied by the defunct Glenwood Avenue PIAS franchise, Grow Biz is not threatened with the same sort of loss of customer good will and loyalty that is at stake in the cases cited by Grow Biz.[8]

---

[8] To the extent that Grow Biz may lose customer good will and loyalty, it is more likely because of the loss of the franchise and not the existence of the Sports X-Change. Grow Biz suggests that the "unquantifiable damage" that it will experience is not limited to loss of good will and loyalty, but, rather, includes the Defendants shifting effort from their ongoing

Even if the Court were to accept the proposition that, in the franchise context, breach of a valid covenant not to compete creates a presumption of irreparable harm, that presumption could certainly be rebutted. Here, Grow Biz's own conduct indicates a lack of urgency: although the franchise agreement expired in late September and Grow Biz initiated this lawsuit on October 2, 2001, Grow Biz did not even seek injunctive relief until filing the instant motion on December 5, 2001.

Finally, the Court must also consider the countervailing harm that would accrue to the Defendants if an injunction is entered; the Court must always consider what damage will be done if the Court's evaluation of the merits is in error. Defendants will be compelled to continue paying for the lease of the Glenwood Avenue location; Defendants will likely have to lay off or terminate a number of employees; and the viability of the Sports X-Change will be irreparably damaged so that, in the event that the Court ultimately concludes that the covenants are *not* enforceable, the Defendants will have been wrongly damaged in a manner for which they will have no remedy.

The Court understands the position of Grow Biz, but the Court must also keep in mind the extraordinary nature of the relief requested. After a careful consideration of the facts and circumstances of this case, the Court concludes that the equities weigh against issuance of a preliminary injunction. That said, the Court further notes that the potential damages for which the Defendants may be liable continue to accrue each day the Sports X-Change continues to operate. Given the potential losses to both parties–made all the more acute by the looming

---

PAIS franchises to the Sports X-Change concern. That sort of loss, however, would seem to be readily quantifiable (simply by looking at profit trends and expected royalty amounts), and thus amenable to money damages.

expiration of still more franchise agreements between the parties–the Court strongly urges the parties to engage in some sort of settlement agreement so that they do not find themselves in an ever-deepening hole.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss or to Transfer Venue (Doc. No. 15) is **DENIED**.

2. Plaintiff's Motion for Preliminary Injunction (Doc. No. 3) is **DENIED**.

Dated: January 25, 2002

DONOVAN W. FRANK
Judge of United States District Court